959 F.2d 234
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
LOUISVILLE GRAPHIC COMMUNICATIONS, LOCAL N-619, Plaintiff-Appellee,
v.
STANDARD GRAVURE CORPORATION, Defendant-Appellant.
 No. 91-5976.
 United States Court of Appeals, Sixth Circuit.
 April 7, 1992.
 
 Before KENNEDY and BATCHELDER, Circuit Judges, and TAYLOR, District Judge.*
 PER CURIAM:
 
 
 1
 Defendant Standard Gravure Corporation (SGC) appeals the order of the District Court granting the motion for summary judgment by plaintiff Louisville Printing and Graphic Communications Union, Local N-619 (Union) and upholding the decision of the labor arbitrator that SGC was in violation of the collective bargaining agreement. For the following reasons, we AFFIRM.
 
 I.
 
 2
 SGC operates a commercial rotogravure printing plant in Louisville, Kentucky. For many years SGC had been a large printer of Sunday magazines for a number of newspapers. Currently, SGC specializes in printing newspaper advertising inserts and retail catalogues. Union is a successor to Louisville Printing and Graphic Communications Union N-19, which was a party to a collective bargaining agreement with SGC.
 
 
 3
 Prior to 1978, SGC contracts with the Union contained provisions for minimum "manning," the number of employees assigned to each operating press. In 1978, SGC sought to eliminate the manning requirements. In return for a reduction in the manning requirements, the Union sought lifetime employment guarantees for its members. The compromise eventually reached was set forth in Memorandum of Understanding No. 2, and provided for reduced manning levels, early retirement for 31 employees, a $5,000 bonus for remaining pressmen, and a pool of extra shifts of work called "security days."
 
 
 4
 The 163 journeymen who were eligible for security days were listed in Memorandum of Understanding No. 2. Any individual on the list could claim a security day whenever he was without full employment after all contractual and all agreed upon manning requirements were met. Initially, a pool of 1,000 shifts was established; thereafter the number of security days would be recalculated each year by multiplying the remaining number of listed journeymen by a fixed factor.
 
 
 5
 On November 10, 1988, a fire and explosion occurred in the plant. Area 2 of the plant was shut down entirely due to severe damage to the walls and the presses located there. Area 1 was not damaged and lost only one shift. SGC attempted to negotiate concessions with the Union due to the expense of repairing the damaged presses. The negotiations were unsuccessful and the damaged presses were eventually sold to a competitor.
 
 
 6
 On December 30, 1988, SGC announced a lay-off. Eleven of the 163 listed journeymen were among those "permanently laid off." SGC refused to allow these 11 journeymen to apply for overtime or to use security days. The Union filed a grievance protesting the lay-off of journeymen named in the Memorandum of Understanding No. 2. Subsequently, six of the listed journeymen were recalled and returned to work. Three other listed journeymen were recalled but declined to return to work. Two of the listed journeymen have not been recalled. When SGC failed to process the grievance, the Union obtained an order from the District Court to compel arbitration.
 
 
 7
 An arbitration hearing was held on August 6, 1990 and the Arbitrator issued an Arbitration Award on November 30, 1990. The Arbitrator sustained the Union's grievance. The Arbitrator determined that, under the Memorandum of Understanding No. 2, the security days were guaranteed to each of the listed journeymen for the full term of his working life subject only to the non-occurrence of a finite number of events. The Arbitrator determined that the use of security days was suspended during the period in which there was a temporary suspension of plant operations due to the fire. The Arbitrator found that the temporary suspension ended when the damage had been assessed, the insurance claims had been paid, and SGC had decided not to repair the presses and restore production in Area 2 and chose instead to sell the damaged presses. At that time, the Arbitrator found, the fire ceased to be the cause of production inactivity in Area 2 and the security days should have been available. The Arbitrator ordered SGC to cease and desist the exclusion of the two remaining laid off journeymen from distribution of security days and to make whole the 11 journeymen for any security days that should have been distributed but were lost.
 
 
 8
 SGC refused to abide by the Arbitration Award and the Union filed a complaint in the District Court seeking enforcement of the award. Both parties filed motions for summary judgment. SGC argued to the District Court that the Arbitrator had exceeded his authority by ignoring the language of the Memorandum of Understanding No. 2. The District Court held that because SGC was arguing that the Arbitrator had made an erroneous legal analysis, United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29 (1987) required the District Court to confirm the award. The District Court thus granted the Union's motion for summary judgment.
 
 II.
 
 9
 In United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29 (1987), the Supreme Court reaffirmed the principle that courts play only a limited role in reviewing the decision of an arbitrator. "[C]ourts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." Id. at 36. A court is limited to determining whether the party seeking arbitration is making a claim which is governed by the contract. Id. at 37. The Court stated:
 
 
 10
 the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.
 
 
 11
 Id. at 38.
 
 
 12
 We find that the Arbitrator construed the Memorandum of Understanding No. 2 in a rational way and was not exercising "his own notions of industrial justice" in his award. The Arbitrator found the following language of Memorandum of Understanding No. 2 to be controlling:
 
 
 13
 [T]he Company hereby guarantees to the Union and to the named employees that it will abide by the following arrangement:
 
 
 14
 .............................................................
 
 
 15
 ...................
 
 
 16
 * * *
 
 
 17
 These Security Days are guaranteed to be available to each of the journeymen named below for the full term of his normal working life, until the individual becomes eligible for full retirement benefits under the Company's pension plan, or accepts early retirement, or becomes permanently disabled, or resigns, or dies, or is discharged for cause, or permanently transfers out of the bargaining unit.
 
 
 18
 .............................................................
 
 
 19
 ...................
 
 
 20
 * * *
 
 
 21
 In the event any of the individuals listed below fail to work as a result of a labor dispute against the Company, or if a temporary suspension of operation is caused through no fault of the Company, including, but not limited to fire, sabotage, or acts of God, the guarantee will be suspended during such individual's failure to work or until production resumes and the named individual returns to work in the pressroom.
 
 
 22
 The Arbitrator found that the fire caused a temporary suspension of the security days, and he interpreted "temporary suspension of operation" to be the time while ordinary production was impossible due to assessing the damage caused by the fire, filing insurance claims, and considering future production alternatives. The Arbitrator found that the temporary suspension ended "at the moment when management made the last of such decisions, for it was then that the fire ceased to be the genuine cause for the continued inactivity in Area 2 of the plant."
 
 
 23
 We find that the Arbitrator was deciding a claim that was governed by the Memorandum of Understanding No. 2 and that his interpretation of the contract was reasonable. The language of the Memorandum of Understanding No. 2 guarantees security days to the listed journeymen and provides for only a temporary, not permanent, suspension of security days following a fire. We find that the Arbitrator made his decision from the essence of the contract, and that under Misco, this Court may not further review the Arbitration Award.
 
 III.
 
 24
 Accordingly, the order of the District Court that SGC shall implement and abide by the Arbitration Award is AFFIRMED.
 
 
 
 *
 The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation